# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| GORDON W. DIGGLE, III, | ) | CASE NO. 3:13-cv-00442 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| ED SHELDON, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Gordon W. Diggle, III ("Diggle"), challenges the constitutionality of his conviction in the case of *State v. Diggle*, Auglaize County Court of Common Pleas Case No. 2010CR0174.  Diggle, represented by counsel, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on March 1, 2013.  On May 14, 2013, Warden Ed Sheldon ("Respondent") filed his Answer/Return of Writ.  (ECF No. 7.)  Diggle filed a Traverse on June 4, 2013.  (ECF No. 8.)  For reasons set forth in detail below, it is recommended that Diggle's petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Diggle's conviction as follows:

[*P2]  In February of 2010, Steven Casad ("Casad") was at home with his girlfriend, Brenda Fischer ("Fischer"), and two friends, Larry Thomas ("Thomas") and Diggle. (Trial Tr. at 351).  Thomas and Diggle began fighting in Casad's kitchen. (*Id*. at 352).  Casad called the police on the two men. (*Id*.).  Diggle did not return to Casad's house in the months following the incident. (*Id*. at 358).

[*P3]  On September 8, 2010, Casad went to happy hour at the Friendly Tavern around 3 p.m. (*Id*. at 325-328).  Diggle arrived at the Friendly Tavern between 5 and 6 p.m. (*Id*. at 274).  Diggle sat near Casad and Casad bought them each a couple of beers. (*Id*. at 288).  After finishing the drinks, Casad and Diggle left the Friendly Tavern and went into the alley next to the building. (*Id*. at 281-282).  While in the alley, Diggle beat Casad and robbed him of roughly $750, telling Casad, "call the cops now" during the beating. (*Id*. at 350); (Ex. H).  Diggle then walked across the street from the Friendly Tavern, got in his car, and left. (Trial Tr. at 282).

[*P4]  Casad, who lived about a block from the Friendly Tavern, returned home around 6 p.m. (*Id*. at 283, 328).  Fischer could see Casad was bleeding from multiple injuries and called 911. (*Id*. at 332, 336).  Emergency personnel arrived and transported Casad to the local hospital where the medical staff discovered Casad had an epidural hematoma, a traumatic brain injury. (*Id*. at 336, 724).  Casad was then transferred by helicopter to a hospital near Dayton, Ohio, where he underwent a craniotomy. (*Id*. at 353, 768).

[*P5]  Following the craniotomy, Casad was sedated to reduce the swelling in his brain. (*Id*. at 770).  On September 12, 2010, Casad developed a pulmonary embolism as a result of his immobility. (*Id*. at 771-773).  Casad died an hour and ten minutes after the pulmonary embolism was detected. (*Id*. at 797).

[*P6]  The coroner determined that Casad died as a result of blunt force trauma to the head. (*Id*. at 847).  During the trial, the coroner testified that the craniotomy and sedation were necessary to treat the blunt force trauma, and the pulmonary embolism was a result of the sedation. (*Id*. at 846-847).  Consequently, the coroner determined that Casad's death was a homicide caused by a blunt force trauma. (*Id*. at 847).

*State v. Diggle*, 2012 Ohio App. LEXIS 1396, 2012-Ohio-1583 (Ohio Ct. App., Apr. 9, 2012)

## II. Procedural History

### A.    Conviction

On December 16, 2010, an Auglaize County Grand Jury charged Diggle with two counts

-2-

of murder in violation of Ohio Revised Code ("O.R.C.") § 2903.02(B), one count of felonious

assault in violation of O.R.C. § 2903.11(A)(1), and one count of aggravated robbery in violation

of O.R.C. § 2911.01(A)(3).  (ECF No. 7-1, Exh. 1.)

Prior to trial Diggle filed a motion *in limine* seeking to suppress statements made by the

victim-decedent to a number of people.  (ECF No. 7-1, Exh. 8.)  The trial court denied the

motion as it related to the testimony of Brenda Fischer, the victim's girlfriend.  (ECF No. 7-1,

Exh. 10.)  It further denied the motion as it related to statements made by the victim to

medical/EMS personnel.  *Id.*  Finally, it denied the motion as it related to the victim's statements

to police officers at his residence.  *Id.*  However, the motion to suppress was granted as to the

victim's statements in response to questions by Officer Turpin made at the Emergency Room

("ER").[1]  *Id.*

On April 26, 2011, a jury found Diggle guilty as charged.  (ECF No. 7-1, Exh. 11.)  On

July 22, 2011, the trial court merged the conviction for felonious assault under Count II with the

conviction for murder under Count I.  (ECF No. 7-1, Exh. 13.)  In addition, as the conviction for

murder under Count III was pled in the alternative to Count I, no sentence was imposed as to

Count III.  *Id.*  The trial court sentenced Diggle to an indefinite term of fifteen years to life

imprisonment for murder, along with a $2,500 fine, and a consecutive term of ten years for

aggravated robbery.  *Id.*

**B.   Direct Appeal**

On August 22, 2011, Diggle, through counsel, filed a Notice of Appeal with the Court of

---

[1]  Diggle also filed a motion to change venue (ECF No. 7-1, Exh. 3), which the trial court
denied after *voir dire*.  (ECF No. 7-1, Exh. 7.)  This motion is not relevant to the claims
raised in the petition.

Appeals for the Third Appellate District ("state appellate court") raising the following

assignments of error:

    1.   The trial court abused its discretion when it imposed separate sentences for offenses that arose from the same conduct, were not committed separately or with separate animus and should have been merged for sentencing purposes under R.C. 2941.25. (July 22, 2011 Journal Entry: Sentencing T. pp. 24-5).

    2.   Gordon Diggle, III's Sixth Amendment right to confrontation was violated when the State introduced testimonial hearsay statements from the victim-decedent during Mr. Diggle's trial.  Sixth Amendment to the United States Constitution; Section 10, Article I of the Ohio Constitution; *Crawford v Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354. (April 16, 2011 Journal Entry; Volume II, T. pp. 376, 389-392,413,555-556, 602-603).

    3.   Trial counsel provided ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.  *Strickland v Washington*, (1984), 466. U.S. 668. (Volume II, T. pp. 340-344, 575-591, 597-599; April 16, 2011 Journal Entry).

(ECF No. 7-1, Exhs. 14 & 15.)

On April 9, 2012, the state appellate court affirmed Diggle's conviction.  (ECF No. 7-2,

Exhs. 18 & 19.)

On May 14, 2012, Diggle, through counsel, filed a Notice of Appeal with the Supreme

Court of Ohio rasing the following propositions of law:

    1.   An interview that occurs between a victim and a police officer, when no emergency is occurring, produces testimonial statements. The admission of such testimonial statements violates the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

    2.   Trial counsel provides ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, for failing to read a trial court's journal entry regarding prejudicial and unconstitutional testimony.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

(ECF No. 7-2, Exhs. 20 & 21.)

On September 5, 2012, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 7-2, Ex. 23.)

**C.   Federal Habeas Petition**

On March 1, 2013, Diggle filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

> GROUND ONE: The Sixth District, Ohio, Court of Appeals unreasonably applied *Crawford v. Washington*, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *Michigan v. Bryant*, __ U.S. __, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) when it determined that an interview that occurs between a victim and a police officer, when no emergency is occurring, produces nontestimonial statements.
>
> GROUND TWO: The Sixth District, Ohio, Court of Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) when it turned *Strickland*'s reasonable-probability test into a test of sufficiency.

(ECF No. 1.)

### III.  Exhaustion and Procedural Default

**A.   Exhaustion Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and

prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

**B.  Procedural Default Standard**

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id*.  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*,

---

[2]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice."  *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Lovins*, 712 F.3d at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id*. Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal

constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id*. Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented

at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

### IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002))  The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6;

*Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas

-10-

corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

## A.    Ground One: Confrontation Clause

In ground one, Diggle argues that the statements made by the deceased victim, Casad, to police officers Turpin and Eberele; and, firefighter/paramedics Kramer, Scott, and Sweigart were testimonial in nature and, therefore, admitting them at trial violated the Confrontation Clause.[3] (ECF No. 8 at 23.)  Respondent asserts that the state court determining the statements were non-testimonial was neither an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts.  (ECF No. 7 at 18.)

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  It bars the "admission of *testimonial statements* of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (emphasis added).  In *Crawford*, the witness statements were made while in custody;

---

[3] Diggle does not argue that the testimony of Casad's live-in girlfriend, Brenda Fischer, violated the Confrontation Clause though she also testified to statements made by Casad, including his identification of Diggle as his assailant.  (ECF No. 7-7; Tr. 323, 350-52.)

after Miranda rights were given. 541 U.S. at 38.  While *Crawford* did not precisely define the term "testimonial," it emphasized that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."  *Id*. at 52.  However, in *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court clarified that statements made to law enforcement officer are not *per se* "testimonial." *Id*. at 822.  The *Davis* court held that "[s]tatements are non-testimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  *Id*.  The Supreme Court's Confrontation Clause jurisprudence was further refined by *Michigan v. Bryant*, 131 S. Ct. 1143, 1157 (2011):

> As our recent Confrontation Clause cases have explained, the existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation.  *See Davis*, 547 U.S., at 828-830, 126 S. Ct. 2266, 165 L. Ed. 2d 224; *Crawford*, 541 U.S., at 65, 124 S. Ct. 1354, 158 L. Ed. 2d 177.  The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S., at 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224.  Rather, it focuses them on "end[ing] a threatening situation." *Id*., at 832, 126 S. Ct. 2266, 165 L. Ed. 2d 224.  Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross- examination.

> [Footnote 8]  The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight.  If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that

belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the "primary purpose of the interrogation" because of the effect it has on the parties' purpose, not because of its actual existence.

This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," Fed. Rule Evid. 803(2); *see also* Mich. Rule Evid. 803(2) (2010), are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. *See Idaho v. Wright*, 497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990) ("The basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation . . . "); 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 803.04[1] (J. McLaughlin ed., 2d ed. 2010) (same); Advisory Committee's Notes on Fed. Rule Evid. 803(2), 28 U.S.C. App., p. 371 (same). An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency.

* * *

The Michigan Supreme Court also did not appreciate that the duration and scope of an emergency may depend in part on the type of weapon employed. The court relied on *Davis* and *Hammon*, in which the assailants used their fists, as controlling the scope of the emergency here, which involved the use of a gun. The problem with that reasoning is clear when considered in light of the assault on Amy Hammon. Hershel Hammon was armed only with his fists when he attacked his wife, so removing Amy to a separate room was sufficient to end the emergency. 547 U.S., at 830-832, 126 S. Ct. 2266, 165 L. Ed. 2d 224. If Hershel had been reported to be armed with a gun, however, separation by a single household wall might not have been sufficient to end the emergency. *Id.*, at 819, 126 S. Ct. 2266, 165 L. Ed. 2d 224.

The Michigan Supreme Court's failure to focus on the context-dependent nature of our *Davis* decision also led it to conclude that the medical condition of a declarant is irrelevant. 483 Mich., at 149, 768 N.W.2d, at 74 ("The Court said nothing at all that would remotely suggest that whether the victim was in need of medical attention was in any way relevant to whether there was an 'ongoing emergency' "). But *Davis* and *Hammon* did not present medical emergencies, despite some injuries to the victims. 547 U.S., at 818, 820, 126 S. Ct. 2266, 165 L. Ed. 2d 224. Thus, we have not previously considered, much less ruled out, the relevance of a victim's severe injuries to the primary purpose inquiry.

Taking into account the victim's medical state does not, as the Michigan Supreme

-13-

Court below thought, "rende[r] non-testimonial" "all statements made while the police are questioning a seriously injured complainant." 483 Mich., at 149, 768 N.W.2d, at 74.  The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.  The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

* * *

Finally, our discussion of the Michigan Supreme Court's misunderstanding of what *Davis* meant by "ongoing emergency" should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry.  As *Davis* made clear, whether an ongoing emergency exists is simply one factor--albeit an important factor--that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.  Another factor the Michigan Supreme Court did not sufficiently account for is the importance of informality in an encounter between a victim and police.  Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to "establish or prove past events potentially relevant to later criminal prosecution," *id*., at 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. *Cf. id*., at 826, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (explaining that Confrontation Clause requirements cannot "readily be evaded" by the parties deliberately keeping the written product of an interrogation informal "instead of having the declarant sign a deposition").  The court below, however, too readily dismissed the informality of the circumstances in this case in a single brief footnote and in fact seems to have suggested that the encounter in this case was formal. 483 Mich., at 150, n. 16, 768 N.W.2d, at 75, n. 16.  As we explain further below, the questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion.  All of those facts make this case distinguishable from the formal station-house interrogation in *Crawford. See Davis*, 547 U.S., at 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224.

* * *

Victims are also likely to have mixed motives when they make statements to the police.  During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant.  A victim may want the attacker to be incapacitated temporarily or rehabilitated.  Alternatively, a

-14-

severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive.  The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution.  Taking into account a victim's injuries does not transform this objective inquiry into a subjective one.  The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim--circumstances that prominently include the victim's physical state.

*Bryant*, 131 S. Ct. at 1157-1162 (footnote 9 & 12 omitted).

In the case at bar, the state appellate court, in a lengthy and thorough discussion, clearly applied the correct governing legal standards stemming from *Crawford* and its progeny:

[*P20]  In his second assignment of error, Diggle argues that the trial court violated his Sixth Amendment rights by admitting Casad's testimonial hearsay statements.  Specifically, Diggle points to the testimony of Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart, and Sergeant Eberle.  Diggle contends that the statements Casad made to these men when they arrived at his house in response to Fischer's 911 call were testimonial in nature.  Diggle argues that the admission of these statements during the trial was a violation of his right to confront the witnesses presented against him.

[*P21]  The Confrontation Clause of the Sixth Amendment states, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."  This Court reviews *de novo* the question of whether a defendant's constitutional rights under the Confrontation Clause have been violated.  *State v. Guiterrez*, 3d Dist. No. 5-10-142011 Ohio 3126, ¶ 43, citing *State v. Smith*, 162 Ohio App.3d 208, 2005 Ohio 3579, ¶ 8, 832 N.E.2d 1286 (8th Dist.).

[*P22]  In *Crawford v. Washington*, the United States Supreme Court determined that "[w]here testimonial evidence is at issue * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).  The Court did not establish a comprehensive definition of "testimonial" but stated that at a minimum, it included prior sworn testimony and police interrogations. *Id*.

 [*P23]  The United States Supreme Court expanded on how courts should determine whether statements are testimonial in *Davis v. Washington*, stating:

Statements are nontestimonial when made in the course of police

-15-

interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L. Ed. 2d 224 (2006).

[*P24]  The United States Supreme Court addressed this issue most recently in *Michigan v. Bryant*, 131 S.Ct. 1143, 179 L. Ed. 2d 93 (2011).  The Court stated that the standard rules of hearsay are also relevant in determining whether out of court statements are testimonial.  *Id*. at 1155.  A court must further "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties" to determine whether the primary purpose was to assist an ongoing emergency. *Id*. at 1156.  As a result, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had."  *Id*.  The court should consider the primary purpose of both the declarant and the interrogator. *Id*. at 1160.  This analysis prevents problems that could arise from mixed motives on the part of the declarant or the interrogator, and also considers that police officers often fulfill the dual responsibilities of first responders and criminal investigators. *Id*. at 1161.  The court should also take into account that the parties' primary purpose can change over the course of the interrogation. *Id*. at 1159.  In those instances, the trial court should exclude those portions of the statements that become testimonial. *Id*. at 1159-1160.

[*P25]  Courts should look at all of the relevant circumstances when determining whether statements are testimonial. *Id*. at 1161.  Specifically, courts should consider the medical condition of the victim and formality of the encounter between the declarant and police officer. *Id*. at 1159-1160.  The Court explained, "[t]he medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.' *Id*. at 1159.  Additionally, the formality of the encounter is relevant because a formal interrogation suggests that the parties are no longer in an emergency situation, although courts should be aware that "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id*. at 1160.  If the circumstances indicate that the primary purpose of the statements is to address an ongoing emergency, then it is presumed that the statements will be reliable and do not require cross-examination pursuant to the Confrontation Clause. *Id*. at 1156.

[*P26]  In the present case, Diggle contends that statements Casad made in the presence of Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart,

-16-

and Sergeant Eberle were testimonial because their primary purpose was to investigate a crime, not to deal with an ongoing emergency.  Officer Turpin, Captain Kramer, Nicholas Scott, and Captain Sweigart were the first responders who arrived at Casad's home in response to Fischer's 911 call. (Trial Tr. at 372, 387, 412, 554).  Officer Turpin was the police officer first called to the scene, while Captain Kramer, Nicholas Scott, and Captain Sweigart were all paramedics who arrived at the same time as Officer Turpin. (*Id*.).  Sergeant Eberle, another police officer, arrived shortly thereafter. (*Id*. at 556, 602).

[*P27]  Captain Kramer testified that when the first responders arrived, Casad's "face was all bloodied, bruising and swelling, mostly on the left side, left eye was almost swelled shut, blood all over his face, his hands, several lacerations." (*Id*. at 373).  Nicholas Scott testified that Casad was "covered in blood and had been what appeared to be assaulted" and that the paramedics began cleaning Casad to determine the extent of his injuries. (*Id*. at 388).  Captain Kramer described Casad as "upset and worried." (*Id*. at 374).  Nicholas Scott testified that while the paramedics began cleaning and treating Casad, Officer Turpin asked him what happened. (*Id*. at 405). Casad stated that he had been at the Friendly Tavern and was jumped in the alley, beaten, and robbed. (*Id*. at 406).  Officer Turpin asked Casad if he knew who had beaten him. (*Id*.).  Casad responded that it was Gordon Diggle. (*Id*.).  Officer Turpin asked Casad if it was the same Gordon Diggle that drove a white Cadillac, and Casad told him it was. (*Id*.). During this exchange, the paramedics continued to clean Casad and evaluate the extent of his injuries. (*Id*. at 390). The paramedics then strapped Casad to their cot and loaded him into the ambulance. (*Id*.).

[*P28]  At trial, Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart, and Sergeant Eberle all testified that Casad had been jumped, beaten, and robbed by Diggle based on Casad's statements. (*Id*. at 371-415, 553-608). Specifically, Officer Turpin testified that Casad told him "that he was jumped in the alley by the Friendly by Gordon Diggle" and that Casad said "that while he was being jumped, Gordon Diggle reached into his pocket and took seven hundred and fifty dollars ($750.00) in cash from him." (*Id*. at 555-556).  Captain Kramer testified that Casad "said he had been at the Friendly Tavern having a few beers because he gave us the name of the gentleman that did this to him and he said they had actually had a few beers.  He had bought the beer."  (*Id*. at 376). Captain Kramer testified that the "gentleman's" name was Gordon Diggle. (*Id*.). Nicholas Scott testified that Casad "said that he was at the Friendly Tavern and he said he got up to leave and was followed out into the alley and from there he was punched," referring to Diggle as the assailant. (*Id*. at 389-392).  Captain Sweigart testified that as they started treating Casad, he said, "I know who did this to me" and identified Diggle. (*Id*. at 413).  Sergeant Eberle testified that "Mr. Casad indicated that he had been assaulted or jumped when he left the Friendly Tavern" and that he said Gordon Diggle was who had assaulted him. (*Id*. at 608).

-17-

[*P29]  The trial court determined that Casad's statements to the emergency personnel were not testimonial and were admissible pursuant to the hearsay exceptions in Evid.R. 803(1) (present sense impression), 803(2) (excited utterance), 803(4) (statements for purposes of medical diagnosis or treatment), and 804(A)(4)(B)(6) (forfeiture by wrongdoing).  We agree with the trial court's conclusion that Casad's statements were not testimonial and admissible as statements made for the purposes of medical diagnosis or treatment.

[*P30]  Turning first to the question of whether Casad's statements were testimonial, the evidence presented at trial established that Officer Turpin arrived on the scene with the paramedics as the first responders to Fischer's emergency call. (*Id*. at 554)  At the hearing on Diggle's motion in limine to exclude Casad's statements, Officer Turpin testified that when he arrived on the scene, he believed Casad may have been part of a bar fight and there could have been other injured individuals. (Motion Hearing Tr. at 63).  At the trial, Officer Turpin further testified that when he began interviewing Casad his "principle objective was trying to figure out exactly what happened at that immediate time." (Trial Tr. at 566).  He stated that he did not view the interaction as a criminal investigation while he was at Casad's house because he asked very few questions and mainly let the paramedics take care of Casad. (*Id*.).  Officer Turpin testified that his interview of Casad did not become a criminal investigation until he had more details about what had occurred. (*Id*.).  Officer Turpin's testimony is supported by an objective view of his questions to Casad, which were limited to asking what had occurred, who else was involved, and clarifying that Casad was referring to Diggle and not Diggle's father, who has the same name. (*Id*. at 405-406).  The interview was very brief, taking place while the emergency personnel were evaluating the nature of Casad's injuries and preparing to load him into the ambulance. (*Id*. at 413).  Thus, the purpose of Officer Turpin's interview with Casad was to deal with an ongoing emergency by determining what had happened to Casad and who else had been involved, which enabled Officer Turpin to establish the potential danger to Casad, the public, and what steps were necessary to deal with the situation.

[*P31]  Additionally, the formality of the encounter and Casad's medical condition are relevant in determining whether the statements were testimonial. *Michigan v. Bryant*, 131 S.Ct. 1143 at 1159-1160, 179 L. Ed. 2d 93. The United States Supreme Court has concluded that the interview is formal when it occurs at the police station at some point after the event, or if the declarant calmly relates the facts to the officer at the scene of the event after the emergency has ended. *Id*. at 1153-1155; *Davis*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224.  On the other side of the spectrum is the informal interview, which the Court has found includes when the declarant is on the phone with a 911 operator while the emergency is occurring. *Bryant* at 1159-1160; *Davis*.  The present case falls on the informal side of the spectrum.  The first responders arrived at Casad's home

-18-

within minutes of Fischer's emergency call. (Trial Tr. at 394).  Casad had been recently beaten and robbed, and was suffering from numerous serious injuries. (*Id*. at 373-376).  The paramedics testified that Casad was "upset" and 'worried." (*Id*. at 373-374, 389).  Officer Turpin interviewed Casad at Casad's house while paramedics treated him and prepared him for transport to the hospital, which occurred within the span of 10 to 15 minutes from the time the first responders arrived on the scene. (*Id*. at 372-375).  Furthermore, Casad was suffering from an epidural hematoma (bleeding in the brain), swelling in his brain, a fractured orbit (eye socket), and numerous lacerations. (*Id*. at 718-725). The extent and nature of Casad's injuries provides additional support for the conclusion that the primary purpose of Casad's statements was to assist Officer Turpin in addressing the ongoing emergency.

[*P32]  Finally, the issue of whether the statements are admissible under a hearsay exception is relevant, but not dispositive, to this Court's determination of whether the statements were testimonial. *Bryant* at 1155.  Captain Kramer testified that he did not remember what he said on the scene to Casad, but it would be common for him to ask him general questions such as the time of day or if he remembered what had happened. (*Id*. at 378-379).  Captain Kramer testified that the purpose of these questions is to determine "a level of consciousness to see if they are alert." (*Id*. at 379).  The testimony at trial implied that Officer Turpin, not Captain Kramer, questioned Casad regarding what had occurred. (*Id*. at 405-406). However, Casad's ability to recall what had happened to him was relevant to the  paramedics' ability to determine Casad's level of consciousness regardless of which first responder began the interview.  Thus, these statements were made for the purpose of medical treatment and were thus admissible under Evid.R. 803(4). Since the primary purpose of the statements was to address an ongoing emergency and provide the paramedics with information to treat his injuries, Casad's statements were not testimonial and therefore were admissible.

*Diggle*, 2012-Ohio-1583.

Diggle appears to argue that the state appellate court's decision misapplied the facts to the law.  This is based on Diggle's conclusion that there was no ongoing emergency, and because the victim did not claim that he was attacked with a gun.  (ECF No. 8 at 24.)  Therefore, Diggle avers that "the crime ... was over" when the victim's statements were made.  *Id*. at 25.  "The appropriate inquiry under AEDPA is 'not whether a federal court believes a state court's determination .... was incorrect but whether that determination was unreasonable  – a

-19-

substantially higher threshold.'" *Tapke v. Brunsman*, 2014 U.S. App. LEXIS 8372 (6th Cir.

2014) (*quoting Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251

(2009)). Diggle has not cleared this threshold by simply arguing that the facts of this case could

have supported a finding that the evidence was testimonial. The case at bar is not factually

identical to the *Bryant* decision, as therein the victim was shot. Nonetheless, many of the other

factors discussed in *Bryant* lend support to the finding that the victim's statements were non-

testimonial. Arguably, there was an on-going emergency with the possibility of other injuries.

The victim was still in an excited state, being upset, worried, and severely injured.[4]

Furthermore, the conversation took place in an informal setting during the course of medical

treatment. This Court cannot find that the state appellate court unreasonably applied the facts of

this case to the governing legal principles.

    As such, the state appellate court's decision was not "so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.[5]

    Finally, as correctly noted by the state appellate court, Confrontation Clause claims are

subject to harmless error. "We review a habeas petitioner's claim of Confrontation Clause

violations for harmless error." *Dittrich v. Woods*, 419 Fed. App'x. 573, 578 (6th Cir. 2011),

*citing Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

---

[4] As stated in *Bryant*, a severely injured victim – someone like Casad – may have had no
purpose at all in answering questions posed and answered reflexively.

[5] Diggle argues that the victim's statements were not admissible under the forfeiture-by-
wrongdoing doctrine. (ECF No. 8 at 25-28.) This argument is moot as it does not form
the basis of the state appellate court's decision.

*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (The correct inquiry is whether the error had

substantial and injurious effect or influence in determining the jury's verdict.); *Kotteakos v.*

*United States*, 328 U.S. 750, 776 (1946).

> The standard as set forth in *Brecht* does not require the petitioner to bear the
> burden of establishing whether the error was prejudicial. Rather, the United
> States Supreme Court has explained that the district court judge should ask him or
> herself "'Do I, the judge, think that the error substantially influenced the jury's
> decision?'" *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed.
> 2d 947 (1995). "If the judge is certain that the error had no or a small effect, the
> verdict must stand. However, if the matter is so evenly balanced that the judge
> has 'grave doubts' as to whether the trial error had substantial or injurious effect
> or influence in determining the jury's verdict, such that the matter is so evenly
> balanced that he feels himself in a 'virtual equipoise' as to harmlessness, the
> judge must treat the error as if it were harmful and grant the petitioner's writ."
> *Jensen v. Romanowski*, 590 F.3d 373, 378 (6th Cir. 2009), quoting *O'Neal*, 513
> U.S. at 435 & 445; *Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006).

*Babcock v. Metrish*, 465 Fed. App'x. 519, 522 (6th Cir. 2012).

The state appellate court found even if the victim's statements were characterized as

testimonial and the corresponding testimony of the police officers, firefighters, and paramedics

were improperly admitted, the error was harmless:

> [*P33] Even assuming arguendo that the statements were testimonial, their admission
> would be harmless error in light of the remaining evidence. "A constitutional error can
> be held harmless if we determine that it was harmless beyond a reasonable doubt." *State
> v. Conway*, 108 Ohio St.3d 214, 2006 Ohio 791, ¶ 78, 842 N.E.2d 996, citing *Chapman v.*
> *California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L. Ed. 2d 705 (1967).

> [*P34] The cumulative evidence, which Diggle does not contest in the present appeal,
> demonstrates that any error in admitting the first responders' testimony is harmless
> beyond a reasonable doubt. Numerous other witnesses provided the same information as
> the first responders. At trial, Fischer testified that after he returned to the house, Casad
> stated that he had been beaten and robbed by Diggle, and that Diggle stole $800. (Trial
> Tr. at 350). According to Fischer, Diggle told Casad, "call the cops now," while Diggle
> was beating Casad. (*Id*. at 333-350.) Gary Cathcart, a physician's assistant at the Joint
> Township emergency department, testified that

> the patient reported to me he was assaulted approximately ten minutes

-21-

before calling EMS.  He was jumped from behind by what he describes as a friend at the Tavern.  States he was sucker punched and he reports that the person that attacked him had an altercation at his house earlier with another man. He called the police to get them out of the house and keep them from breaking up his house. (*Id*. at 717).

Brenda Warniment, a nurse at the Joint Township emergency department, testified that during her neuro assessment of Casad, he told her that he was kicked, punched, and beat by Diggle. (*Id*. at 693-694).  Brenda Warniment further testified that Casad stated that he had been assaulted because he had previously called the police on Diggle. (*Id*. at 694-695).  Erica Zimpher, a flight nurse that did Casad's critical care transport, testified that Casad stated that he "had been stomped in the head by a guy with steel toe boots."  (*Id*. at 730).  Thus, Casad consistently stated that Diggle had robbed and beaten him because Casad had previously called the police on Diggle.

[*P35]  Diggle's own actions provide further evidence.  Brenda Chaney, the bartender at the Friendly Tavern, testified that Diggle left with Casad, appeared to go into the alley his Casad, and then Diggle walked across the street to his car a few minutes later. (*Id*. at 282).  Shortly thereafter, Brenda Chaney observed an ambulance pull up to Casad's house. (*Id*. at 282-283).  Thomas, a mutual friend, testified that he went to breakfast with Diggle the morning of the incident. (*Id*. at 443).  At that time, Diggle had roughly $100. (*Id*.).  Thomas received a phone call from Diggle the day after the incident, and Thomas told Diggle he needed to turn himself in. (*Id*. at 447-448).  Diggle told Thomas, "What? I didn't do nothing. Steve Casad went in the alley and I took off." (*Id*. at 448).  Diggle then threatened to beat Thomas if he went to the police. (*Id*.). Doug Adams, a friend of Diggle's, testified that Diggle showed up at his house unannounced between 6 and 6:30 p.m. the day of the incident and that Diggle had a large amount of money with him. (*Id*. at 424).  Randy Simpson worked at a concession wagon with Diggle in the days following the incident and testified that Diggle had a large amount of money when they left to work for the weekend. (*Id*. at 677-680).  Randy Simpson further testified that Diggle told him that "the law was looking for his brother for something that happened in a bar with somebody getting beat up and robbed." (*Id*. at 681).  Finally, Loretta Avila, Diggle's aunt, testified that she saw Diggle after the incident and told Diggle "that guy died." (*Id*. at 889).  In response, Diggle said, "no way." (*Id*.).

[*P36]  In addition to Casad's numerous, consistent statements, Diggle's own actions thus establish that he was near the Friendly Tavern at the time that Casad was beaten and left shortly before Casad arrived home seriously injured.  Diggle also had a substantially smaller amount of money the morning of the incident than in the evening and days following the incident.  Finally, Diggle made incriminating statements to his co-worker, his aunt, and threatened a friend.

[*P37]  This Court finds that the first responders' statements were admissible because their primary purpose was to address an ongoing emergency. However, if there was any error  in admitting the statements of the first responders, this Court concludes that it was harmless beyond a reasonable doubt due to the cumulative effect of the evidence.

*Diggle*, 2012-Ohio-1583.

Diggle has not argued that the testimony of the victim's girlfriend, a physician's assistant, and two nurses was improperly admitted.  All of those sources essentially testified that the victim told them that Diggle was the attacker.  Therefore, the testimony of the first- responders was largely cumulative.  In addition, the evidence from other sources, though mostly circumstantial, lends support to the conviction.  Given the remainder of the evidence against Diggle, the state appellate court's finding that any error was harmless was not unreasonable.

**B.  Ground Two: Ineffective Assistance of Trial Counsel**

In ground two of the petition, Diggle argues that his trial counsel was ineffective and that the state appellate court improperly applied the *Strickland* test.

First, to establish ineffective assistance, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution.  *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise

would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy. *Id*. at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained recently by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington v. Richter,* 131 S. Ct. 770, 788 (U.S. 2011); *accord Kennedy v. Warren*, 2011 WL 1642194, *2 (6th Cir. May 3, 2011); *accord Goza v. Welch*, 2012 U.S. Dist. LEXIS 178665 at **24-25 (N.D. Ohio Dec. 18, 2012).

Specifically, Diggle argues that he received ineffective assistance because trial counsel misunderstood the trial court's ruling on the motion in *limine*, excluding certain statements made

by the victim to Officer Turpin while in the ER.[6]  (ECF No. 8 at 30.)  Diggle avers that defense

counsel then proceeded to open the door to the exact testimony that was excluded by the trial

court's ruling.  *Id*. at 31.  The state appellate court found as follows:

> [*P39]  In his third assignment of error, Diggle argues his trial counsel was
> ineffective.  Diggle contends that his trial counsel did not understand the trial
> court's ruling on Diggle's motion *in limine*, and committed prejudicial error by
> admitting statements that had been excluded.
>
> [*P40]  A defendant asserting a claim of ineffective assistance of counsel must
> establish: (1) the counsel's performance was deficient or unreasonable under the
> circumstances; and (2) the deficient performance prejudiced the defendant.  *State
> v. Kole*, 92 Ohio St.3d 303, 306, 2001 Ohio 191, 750 N.E.2d 148 (2001), citing
> *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L. Ed. 2d 674
> (1984). Prejudice results when "there is a reasonable probability that, but for
> counsel's unprofessional errors, the result of the proceeding would have been
> different." *Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), citing
> *Strickland* at 694.  "A reasonable probability is a probability sufficient to
> undermine confidence in the outcome."  *Bradley* at 142; *Strickland* at 694.
>
> [*P41]  In order to show counsel's conduct was deficient or unreasonable, the
> defendant must overcome the presumption that counsel provided competent
> representation and must show that counsel's actions were not trial strategies
> prompted by reasonable professional judgment.  *Strickland* at 687. Counsel is
> entitled to a strong presumption that all decisions fall within the wide range of
> reasonable professional assistance. State v. Sallie, 81 Ohio St.3d 673, 675, 1998
> Ohio 343, 693 N.E.2d 267 (1998). Tactical or strategic trial decisions, even if
> unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72
> Ohio St.3d 545, 558, 1995 Ohio 104, 651 N.E.2d 965 (1995).  Rather, the errors
> complained of must amount to a substantial violation of counsel's essential duties
> to his client. *Bradley* at 141-142, citing *State v. Lytle*, 48 Ohio St.2d 391, 396,
> 358 N.E.2d 623 (1976).
>
> [*P42]  According to *Strickland*, we must first determine whether counsel's
> performance was deficient or unreasonable under the circumstances.  *Id*. at 687.

---

[6]  The content of the disputed testimony is the victim's statement to Officer Turpin that
Diggle stated "I'll teach you to call the cops on me again," while kicking him – an
apparent reference to an earlier altercation that occurred at the victim's house where the
victim called the police to break up a fight between Diggle and a third party.  (ECF No. 8
at 29.)

At issue, in his motion *in limine*, is testimony Diggle contended was inadmissible. (Doc No. 84). The trial court granted Diggle's motion in regards to statements Casad made to Officer Turpin while Casad was at the Joint Township emergency department. (Doc. No. 109). These statements included Casad's assertion to Officer Turpin that Diggle stated "I'll teach you to call the cops on me again," while he was beating Casad. (*Id*.); (Ex. H).

[*P43] During his cross examination of Officer Turpin, counsel questioned Officer Turpin at length regarding the scope of his investigation. (Trial Tr. at 572-578). The purpose of this line of questioning was to impeach Officer Turpin's credibility regarding the extent of the investigation and demonstrate for the jury that the police focused their investigation solely on Diggle and failed to consider other suspects. (*Id*.). During defense counsel's cross examination, the State objected, stating "[t]his witness is already instructed not to answer that question pursuant to the *Motion in Limine*." (*Id*. at 587). The following exchange then occurred:

> **Trial Court**: Okay. But if the door's opened, the door's open. He (defense counsel) opened the door. * * * He's opened the door by asking what all this officer contemplated and so forth. So if he's opened the door, he's opened the door.

> **Defense Counsel**: I just want to make sure there's no misunderstanding. The Motion in Limine does not take and stop me from doing anything.

> **Trial Court**: That's right and if you open the door, you open the door.

> **Defense Counsel**: And the door's been opened because the Court has said that all this testimony is admissible.

> **Trial Court**: No, that's not true. The Court limited certain testimony. Now you've opened the door to it. But he'll answer the questions. I'll instruct him to answer the questions. (*Id*. at 587-588).

This exchange between the trial court and defense counsel indicates that although defense counsel had a tactical purpose for questioning Officer Turpin about his investigation, defense counsel may not have realized the question was opening the door to evidence that had been excluded under the motion *in limine*. (*Id*.). Consequently, this Court must now consider whether Diggle was prejudiced by the resulting testimony.

[*P44] After the trial court ruled defense counsel had opened the door to previously excluded testimony, Officer Turpin testified on cross examination that Casad had told him that Diggle stated, "I'll teach you not to call the cops on me

again." (*Id.* at 591).  The trial court also admitted Officer Turpin's report, which stated:

> Mr. Casad said that he had gone into the Friendly Tavern and had been drinking with Gordon Diggle. He said it was just those two and the barmaid and that he had purchased a drink or two for Diggle. Casad says he always carries a large quantity of cash that he rolls up in his pocket and estimated it to be $700 to $750. He says that as he walked out of the Friendly Tavern and started to walk through the alley, he was assaulted and beaten by Gordon Diggle who then reached in his pocket, stole his money. Casad said that he thought that Diggle was going to kill him. He said that Diggle's [sic] walked across the street and left in his white Cadillac. (Ex. H).

> [*P45]  We cannot find that this admitted evidence prejudiced Diggle. Throughout the trial, other witnesses testified to the same facts.  Thus, the evidence was cumulative and did not result in prejudice to Diggle. Consequently, we cannot find that there is a reasonable probability that the outcome of the trial would have been different absent this evidence.

*Diggle*, 2012-Ohio-1583.

Diggle asserts that the state appellate court misapplied *Strickland*, converting the prejudice prong into a sufficiency inquiry.  (ECF No. 8 at 33-34.)  The Court disagrees.  There is nothing unreasonable in the appellate court's determination.  Assuming *arguendo* that counsel's performance was deficient, *Strickland* requires that a defendant demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  The state court determined that the statements made by the victim to Officer Turpin in the ER were cumulative and, therefore, there was no reasonable probability that the exclusion of the evidence would have resulted in a different outcome.[7]  This is precisely the

---

[7]  Diggle contends that while the jury had already heard that the victim identified him as the attacker, "[n]obody could testify as to exactly why Mr. Casad named Mr. Diggle as the attacker ...."  (ECF No. 8 at 33.)  This assertion is incorrect.  The victim's live-in girlfriend, Fischer, expressly testified that Diggle said "Call the cops now," while he kicked the victim.  (Tr. 351.)  She then went on to describe an occasion in February of 2010 when the victim called the police after Diggle and another guest got into a fight at

analysis *Strickland* requires.

## V.  Conclusion

For the foregoing reasons, it is recommended that Diggle's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: May 21, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

the victim's house.  (Tr. 351-52.)  As such, the state court's determination that the evidence was cumulative was accurate.

-28-